IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

VICTORIA K. SHREVE,

                Plaintiff,

        v.                                   Civil Action No. 2:05-CV-51

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.      Background

      Plaintiff, Victoria K. Shreve, (Claimant), filed her Complaint on June 28, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on January

25, 2006.[2]   Claimant filed her Motion for Summary Judgment on March 29, 2006.[3]

Commissioner filed her Motion for Summary Judgment on April 24, 2006.[4]  Claimant filed her

Response on May 4, 2006.[5]

B.      The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 18.

[4] Docket No. 19.

[5] Docket No. 20

1.      Claimant's Motion for Summary Judgment.

2.      Commissioner's Motion for Summary Judgment.

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED because the ALJ could consider Claimant's smoking habit in determining her credibility; because even though the ALJ made a factual error when evaluating Claimant's smoking habit, the error was harmless; because the ALJ's question to the Vocational Expert about a "sit/stand option" adequately informed him of Claimant's need to sit or stand at will; and because although the ALJ relied on erroneous Vocational Expert testimony that Claimant could perform the work of general office clerk, Claimant still had significant numbers of jobs available to her in the national economy.

## II.  Facts

A.      Procedural History

 Claimant first filed an application for Social Security Disability Benefits on October 29, 2003, alleging disability since June 1, 2000.  Her claim was denied initially and on reconsideration.  Claimant timely filed a request for review by an ALJ.  A hearing was held before an ALJ on October 15, 2004.  The ALJ issued a decision unfavorable to Claimant on November 4, 2004.  Claimant filed a request for review with the Appeals Council, but it denied review.  This action was filed and proceeded as set forth above.

B.      Personal History

Claimant was 46 years old on the date of the October 15, 2004 hearing before the ALJ.

Claimant has a high school education. Claimant has prior relevant work experience as a cashier,

housekeeper/cleaner, maid/cleaner, sander, cook/waitress, and home health aide.

C.      Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: June 1, 2000 – November 4, 2004.

**Steven Barnett, M.D., 2/1/01, Tr. 179**
Impression: negative mammogram

**P. S. Khatter, M.D., 7/3/00, Tr. 180**
Impression: no growing mass is seen where patient says there is a nodule

**P. S. Khatter, M.D., 1/28/00, Tr. 181**
Impression:
1.  Surgical consultation should be obtained.
2.  It may be deemed sufficient to keep the nodule under observation, and follow up with six
month mammogram.  Or it may be deemed proper to take the nodule out.  This should be done on
clinical grounds only.  The nodule is so superficial and close to an inverted nipple that it would be
difficult to localize.

**P. S. Khatter, 1/28/00, Tr. 182**
Impression: about 5mm nodule very close to the left nipple which is inverted

**Steven Barnett, M.D., 5/22/99, Tr. 183**
Impression: rather advanced degenerative disc disease at L3-4.  Otherwise negative exam.

**James D. Weinstein, M.D., 5/24/01, Tr. 190**
The patient continues to suffer from permanent chronic symptoms

**James D. Weinstein, M.D., 3/15/01, Tr. 191**
A myelogram/CT scan revealed degenerative changes and sacralization of L-5 on the right, but
there are no nerve root encroachments or spinal stenosis seen.

**James D. Weinstein, M.D., 4/17/00, Tr. 192**
The patient has degenerative arthritis and arthritis of the facet joints and there is significant
pathology at the 3-4 level.  There seems to be partial sacralization of the S-1.

**James D. Weinstein, M.D., 3/9/01, Tr. 193**

Impression: marked degenerative disc changes of L3-4 with mild anterior impression on the thecal sac. Sacralization of the L5 on the right.

**James D. Weinstein, M.D., 3/9/01, Tr. 194**
Impression: no significant nerve root encroachment or spinal stenosis identified.

**Physical Residual Functional Capacity Assessment, 7/9/01, Tr. 196**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations
      Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
      Extreme heat, extreme cold, hazards: avoid concentrated exposure
      Wetness, humidity, noise, vibration, fumes, odors, gases, dusts, poor ventilation: unlimited

**Psychiatric Review Technique, 7/27/01, Tr. 204**
The patient has no medically determinable impairment

**Physical Residual Functional Capacity Assessment, 9/22/01, Tr. 218**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations
      Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations
      Extreme heat, extreme cold, vibration, hazards: avoid concentrated exposure

Wetness, humidity, noise, fumes odors, gases, poor ventilation: unlimited

**<u>Functional Capacity Evaluation, 3/25/03, Tr. 232</u>**
Material handling ability

Barrier lift:
     Infrequent: 0 pounds
     Occasional: 7 pounds
     Frequent: 5 pounds
     Constant: 4 pounds

Back lift
     Infrequent, occasional, frequent, constant: 0 pounds

Leg lift
     Infrequent, occasional, frequent, constant: 0 pounds

Power lift
     Infrequent, constant: 0 pounds
     Occasional: 12 pounds
     Frequent: 8 pounds

Shoulder lift
     Infrequent: 0 pounds
     Occasional: 9 pounds
     Frequent: 6 pounds
     Constant: 4 pounds

Overhead lift
     Infrequent: 0 pounds
     Occasional: 9 pounds
     Frequent: 6 pounds
     Constant: 4 pounds

Two hand carry
     Infrequent: 0 pounds
     Occasional: 7 pounds
     Frequent: 5 pounds
     Constant: 4 pounds

One hand carry
     Infrequent: 0 pounds
     Occasional: 5 pounds
     Frequent, constant: 4 pounds

Walking push/pull
        Infrequent: 0 pounds
        Occasional: 7/7 pounds
        Frequent: 5/5 pounds
        Constant: 2/2 pounds

Standing push/pull
        Infrequent: 0 pounds
        Occasional: 7/7 pounds
        Frequent: 5/5 pounds
        Constant: 2/2 pounds

Non-material handling ability

Bending, kneeling: infrequent
Squatting, stair climbing: occasional
Ladder climbing, crawling: no qualification

Repetitive and static work ability

Sitting, standing, walking, forward reaching, overhead reaching: occasional
Critical balancing, fine hand (left and right): yes
Arm controls (left and right), leg controls (right): light
Leg controls (left): never

**Robert T. Baird, P.T., 1/24/03, Tr. 233**
Assessment: patient has lumbar spine pain, DJD and acute (L) SI pain.

**Kenneth Noel, M.D., 2/3/03, Tr. 246**
Diagnosis: lumbar sprain/strain

**Kenneth Noel, M.D., 9/10/02, Tr. 251**
Operative findings: none

**Kenneth Noel, M.D., 1/18/02, Tr. 252**
Diagnostic impression: lumbar, degenerative disc disease lumbar 4-5, lumbar facet arthopathy, left sacroiliac joint arthropathy, possible discogenic back pain

**John C. France, M.D., 6/12/03, Tr. 256**
Assessment: The patient's main problem is L4-5 advanced degenerative disc change.

**John C. France, M.D., 6/12/03, Tr. 259**
X-rays of the lumbar spine revealed advanced degenerative changes, essentially bone on bone,

with sclerotic endplate changes at 3-4. There is no destructive change to indicate infection. The remainder of the spine appears well preserved.

**Lucas J. Pavlovich, M.D., 10/9/03, Tr. 260**
Assessment: lumbar spine osteoarthritis and headaches

**Lucas J. Pavlovich, M.D., 7/31/03, Tr. 261**
Assessment: one level degenerative disc

**Lucas J. Pavlovich, M.D., 7/13/00, Tr. 262**
Impression: lumbar spine osteoarthritis as well as carpal tunnel syndrome

**Lucas J. Pavlovich, M.D., 5/25/00, Tr. 263**
Assessment: L5/S1 osteoarthritis

**Jack S. Koay, M.D., 7/23/03, Tr. 267**
Inspection
        Patient stands unassisted: yes
        Scoliosis, antalgic lean, lumbar hypolordosis, lumbar hyperlordosis: no

Palpitation
        Vertebral tenderness/restriction, coccyx tenderness, paraspinal muscle tenderness (left and right), paraspinal muscle spasm (left and right): no
        Sacral base and pelvis level, sacroiliac joint tenderness (left): yes

Gait
        Limp: no
        Assistive devices: none

Squat
        Squats fully and rises without difficulty: no
        Comment: unable to do a full squat

Range of motion
        Sacral flexion: 7 degrees
        Sacral extension: 5 degrees
        Forward bending: 20 degrees
        Backward bending: 8 degrees
        Left side bending: 15 degrees
        Right side bending: 16 degrees

Motor strength
        Hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle dorsification, ankle planter flexion, great toe extension, heel toe walk, toe walk: normal

Grade for all the above mentioned characteristics (left and right): 5/5

Sensory
L3 sensory (left and right), L4 sensory (left and right), L5 sensory (left and right), S1 sensory (left and right): normal

Reflexes
Patellar (left and right): +3
Achilles (left and right): +2

Straight leg raising (sitting)
Left: 35 degrees, pain present in back
Right: 70 degrees, pain present in back

Hip and sacroiliac tests
Hip test pain: no
Sacroiliac test pain: yes, left

Straight leg raising (supine)
Left: 30 degrees, pain present in back
Right: 20 degrees, pain present in back

Pulses
Pulses are present in the left and right dorsalis pedis, as well as the posterior tibial.

Muscle measurement
Left thigh: 44.3cm
Right thigh: 44cm
10cm above tibial tubercle
Left calf: 32.5 cm
Right calf: 32.4 cm
10cm above tibial tubercle

Leg length exam
Legs are symmetrical

Sensory examination: response to pinprick
No deficit or deficit well localized to dermatomes
Amount of body involved: less than 15 percent

Motor examinations
No deficit or deficit well localized to myotomes
Amount of body involved: less than 15 percent

Tenderness
> No tenderness or tenderness localized to anatomically sensible structure
> Amount of body involved: less than fifteen percent

Differential straight leg raising
> The difference between SLR tests performed in the supine and sitting positions.

Difference: less than 20 percent

**Physical Residual Functional Capacity Assessment, 1/15/01, Tr. 273**
Exertional limitations
> Occasionally lift and/or carry 20 pounds
> Frequently lift and/or carry 10 pounds
> Stand and/or walk for a total of about 6 hours in an 8 hour workday
> Sit for a total of about 6 hours in an 8 hour workday
> Push and/or pull: unlimited

Postural limitations
> Climbing: occassionally to never
> Balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
> Extreme cold, hazards: avoid concentrated exposure
> Extreme heat, wetness, humidity, noise, vibration, fumes, odors, gases, dusts, poor
ventilation, etc.: unlimited

**Lucas J. Pavlovich, M.D., 2/26/04, Tr. 281**
Assessment: lumbar spine strain and osteoarthritis

**Lucas J. Pavlovich, M.D., 1/29/04, Tr. 282**
Assessment: frequent headaches

**Functional Capacity Evaluation, 1/13/04, Tr. 286**
Material handling ability

Barrier lift
> Infrequent: 0 pounds
> Occasional: 7 pounds
> Frequent: 5 pounds
> Constant: 2 pounds

Back lift
   Infrequent: 0 pounds
   Occasional: 0 pounds
   Frequent: 0 pounds
   Constant: 0 pounds

Leg lift
   Infrequent: 0 pounds
   Occasional: 0 pounds
   Frequent: 0 pounds
   Constant: 0 pounds

Power lift
   Infrequent: 0 pounds
   Occasional: 9 pounds
   Frequent: 6 pounds
   Constant: 3 pounds

Shoulder lift
   Infrequent: 0 pounds
   Occasional: 7 pounds
   Frequent: 5 pounds
   Constant: 2 pounds

Overhead lift
   Infrequent: 0 pounds
   Occasional: 7 pounds
   Frequent: 5 pounds
   Constant: 2 pounds

Two hand carry
   Infrequent: 0 pounds
   Occasional: 7 pounds
   Frequent: 5 pounds
   Constant: 2 pounds

One hand carry
   Infrequent: 0 pounds
   Occasional: 5 pounds
   Frequent: 4 pounds
   Constant: 2 pounds

Walking push/pull
   Infrequent: 0 pounds

Occasional: 7/7 pounds
Frequent: 5/5 pounds
Constant: 2/2 pounds

Standing push/pull
Infrequent: 0 pounds
Occasional: 7/7 pounds
Frequent: 5/5 pounds
Constant: 2/2 pounds

Non-material handling ability

Bending, kneeling, ladder climbing, crawling: no qualification
Squatting, stair climbing: infrequent

Repetitive and static work ability

Sitting, forward reaching, overhead reaching: occasional
Standing, walking: frequent
Critical balancing, fine hand (left and right): yes
Arm controls (left and right), leg controls (right): light
Leg controls (left): never

**Lucas J. Pavlovich, M.D., 10/9/03, Tr. 287**
Assessment: lumbar spine osteoarthritis and headaches

**Lucas J. Pavlovich, M.D., 7/31/03, Tr. 288**
Assessment: one level degenerative disc

**Lucas J. Pavlovich, M.D., 5/15/03, Tr. 290**
Assessment: lumbar degenerative changes

**Lucas J. Pavlovich, M.D., 2/13/03, Tr. 291**
Assessment: SI strain and osteoarthritis

**Lucas J. Pavlovich, M.D., 11/14/02, Tr. 293**
Assessment: lumbar spine degenerative changes

**Lucas J. Pavlovich, M.D., 10/10/02, Tr. 294**
Assessment: low back pain related to degenerative arthritis

**Lucas J. Pavlovich, M.D., 7/25/02, Tr. 295**
Assessment: Left SI strain

**Lucas J. Pavlovich, M.D., 5/16/02, Tr. 296**
Assessment: Left SI strain and headaches associated with this.

**Lucas J. Pavlovich, M.D., 2/14/02, Tr. 297**
Assessment: low back pain

**Lucas J. Pavlovich, M.D., 12/20/01, Tr. 298**
Assessment: lumbar pain

**Lucas J. Pavlovich, M.D., 7/12/01, Tr. 299**
Assessment: lumbar strain

**Lucas J. Pavlovich, M.D., 7/13/00, Tr. 300**
Impression: lumbar spine osteoarthritis as well as carpal tunnel syndrome.

**Lucas J. Pavlovich, M.D., 5/25/00, Tr. 301**
Assessment: L5/S1 osteoarthritis

**Lucas J. Pavlovich, M.D., 2/17/00, Tr. 302**
Assessment: left sided SI pain

**Lucas J. Pavlovich, M.D., 10/28/99, Tr. 304**
Assessment: lumbar strain, low back pain and left SI strain

**Dennis G. Peterson, PA-C, 8/19/99, Tr. 307**
Impression: DJD of lumbar spine, strain/sprain of the left SI joint

**Dennis G. Peterson, PA-C, 7/22/99, Tr. 309**
Impression: DJD of lumbar spine

**Steven Barnett, M.D., 7/13/03, Tr. 311**
Impression: fairly advanced degenerative disease at L3-4 with associated marrow signal changes in the adjacent end plates. There is no evidence of disc herniation, spinal stenosis, or direct neural impingement.

**Fouad Abdalla, M.D., 4/17/00, Tr. 312**
Impression: degenerative arthritis and arthritis of the facet joints

**Physical Residual Functional Capacity Assessment, 4/1/04, Tr. 329**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations
       Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
       Extreme cold, extreme heat, hazards: occasionally
       Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited

**Steven Barnett, M.D., 7/7/04, Tr. 337**
Impression: degenerative disc disease at C4-5 and especially at C5-6.

**Lucas J. Pavlovich, M.D., 8/26/04, Tr. 341**
Assessment: cervical strain and arthritis, lateral epicondylitis of the left elbow, low back pain.

**Lucas J. Pavlovich, 5/27/04, Tr. 342**
Assessment: lumbar degenerative changes

D.     <u>Testimonial Evidence</u>

[EXAMINATION OF CLAIMANT BY ALJ]

Q     Do you have a driver's license?

A     Yes, sir.

Q     Do you drive?

A     Pardon me?

Q     How many miles can you drive would you say in a week's time?

A     25-30 miles.

Q     Did you drive today from Hutton County?

A     No, sir, my husband drove.

Q     All right.  Do you smoke cigarettes?

A     Yes, sir.

Q	How much?

A	Maybe a half a pack a day.

*       *       *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q	How long can you generally sit without difficulty?

A	I can never sit without difficulty.

Q	If you're sitting in a chair, how long can you usually sit before you would need to change position?

A	Maybe - - before I change position?

Q	Yeah, that means stand up, or whatever you would do?

A	Oh, probably a half-hour.

Q	And the same question with standing?

A	20-30 minutes.  My left leg goes out, sometimes it gets wobbly.  It gives out from under me standing.

Q	Okay.  Does the pain affect you as far as mentally, your concentration?

A	Yes, I make coffee and I'll forget to put the coffee in it.  I'll put something on the stove to cook, and go back and check, and I haven't even turned the burner on.

I have to even pay attention when I'm taking my medicine, and double check to make sure, I do these stupid little things, I have to double check and make sure that I'm doing the right drug and the right amount.  A variety of different things, I just - - just stupid little things that should never even be happening.

Q	Okay.

A       Put the coffee in the refrigerator, the coffee put. [sic] I mean open the fridge and get ready to stick it in the refrigerator, and realize you have the coffee  pot.

                                     *             *             *

Q       Okay.   How much can you lift without any problem?

A       Well it hurts to lift a milk jug.  A milk jug pulls my back, to pull it out of the refrigerator and onto the table.

Q       So would that be less than ten pounds?

A       Yes.

Q       What about just bending over, or stooping?

A       No, I can't bend, I can't stoop, I can't twist.  I have - -

Q       What about - - okay, I'm sorry, go ahead.

A       I'm sorry.  I have to pretty well keep it straight, if I arch it all, it's unbearable.

Q       What about reaching up with your left arm?

A       No, I can't do that.

Q       What about reaching forward with your left arm like this?

A       Well that's hard to do too, because it stays numb a lot.  Just a burning sensation constantly all the time, and it has been for a long time, but in the last several months it goes dead a lot.

Q       How do you sleep at night time?

A       Not good.

Q       Why is that?

A       Well I wake like 3:00-4:00 o'clock in the morning, I may wake several times from

15

3:00 on, from my back hurting.

Q       Okay.  Do you rest at all during the day?

A       Yes.

Q       How do you do that?

A       If I have to lay down, which I do quite often, I have to lay on my stomach, and have my right leg raised, so I can release the pressure off my back.  I can't lay flat on my belly in the bed, and it not hurt.  It hurts regardless lifting my leg, but it takes some of the pressure off it.

Q       And how much time in a typical day, do you think that you do that?

A       Lie down?

Q       Yes.

A       Three, four hours a day.

Q       As far as just general everyday things, like doing your housework, cooking, shopping.  Do you have any difficulty doing those things?

A       Yes.

Q       Can you explain that to me?

A       Well I'll like make coffee, or like something real quick, grill cheese or soup.  As far as lengthy cooking, I don't do it.  I can wipe the counter tops, stand sometimes and fold a few clothes.  My daughter does everything like the mopping.  But anything to do with bending or down low, she does all that, bless her heart.

Q       How about as far as just getting out of the house, do you go anywhere, visit people, do you go to church, anything like this?

A       No, once a month we shop, we grocery shop.  Of course we go to the little town for

bread, and little things, but we go there at least once a month, my daughter and her husband is with me, and we do our grocery shopping. And basically, I don't go anywhere else, unless it's to the doctor's office or what I have to do.

Q        And why is that?

A        Because it hurts.

Q        No.

                    *                    *                    *

[EXAMINATION OF CLAIMANT BY ALJ]

Q        Ms. Shreve, what was the last job you held?

A        The last job?

Q        Right.

A        The Catholic Conference Center at Huntsville.

Q        Okay. And what did you do for them?

A        I worked as a mail, and also a kitchen aide.

Q        Okay. And how much lifting did you have to do in that job? In terms of pounds, would you say?

A        Gosh, I'd say 30, 40, 50 pounds.

Q        And before then, did you work as a maid at a ski resort?

A        Yes, sir.

Q        Okay. And was that like a housekeeper, like at a place like the handicapped, did you clean rooms?

A        Yes, sir.

Q      Okay.  A sander at a sawmill, was that in a standing position?

A      Yes, sir.

Q      And how much lifting was involved in that job?

A      Oh I'd say, an estimated guess, maybe 30 pounds.

Q      Okay.  And the cook/waitress in the late '80's, where did you work then, do you

remember?

A      I'm sorry?

Q      Did you work as a cook?

A      And waitress, through the years off and on.

Q      Yeah, I said where, do you remember where?

A      Over so many years there was a variety of places, like from Snowshoe, clear to

Elkins.

Q      Okay, and home health aide, did you assist others in their homes?

A      Yes, sir.

Q      Did you have to lift the clients?

A      Yes, sir.

                              *              *              *

Q      Okay.  Do you attend church?

A      No, sir.

Q      Do you read?

A      I'm sorry?

Q      Do you read?

A      Yes, sir.

Q      What do you like to read?

A      Basically about anything.  Reader's Digest, just - -

Q      Do you have friends that you go anywhere with?

A      No, sir.

*        *        *

Q      Do you do the laundry, Ms. Shreve?

A      I fold, if I'm standing and my husband and daughter, they'll do the laundry and you know, if they'll throw it on the table and I'm standing there I can do a few pieces, but anything to do with stooping, or getting down low, my daughter or husband generally does it.

*        *        *

Q      Now yesterday, how much did you lie down?

A      Yesterday, a couple three hours.

*        *        *

[EXAMINATION OF VOCATIONAL EXPERT BYALJ]

Q      Would you describe Ms. Shreve's past work?

A      Yes, Your Honor, the work, it would be working with the nuns and priests, she indicated she worked there as a maid, but more of a cleaner.  That work would be medium, and unskilled.  That work was done for approximately four months in the year 2000.  Prior to that she worked as a cashier from April of '99 to January of 2000, that would be light and unskilled.  And on a number of different occasions she worked as a maid, that was in'92 and '93, '98 and '99.  That work would be housekeeping/cleaner, light and unskilled.  She worked at a sawmill as a

sander. According to the DOT that work would be light and unskilled. However she indicated that she may have done that at a heavier level than it is in the DOT, indicating she moved weights of 25 to 50 pounds. Then she worked as a cook/waitress and from '86 to '90, that work would be as a waitress would be light and unskilled. And in 1992, she worked as home health aide, that work would be medium and semi-skilled.

Q       Please assume a younger individual with a high school education, precluding all but the sedentary work, with a sit/stand option. No climbing, occasional posturals. No hazards. With those limitations - - no temperature extremes. With those limitations can you describe any work this hypothetical individual can perform?

A       Yes, Your Honor. And I'll define the local economy as 20 percent of all jobs in the State of West Virginia based on the Bureau of Labor Statistics. There would be the work of an interviewer, in the local economy there are 78 jobs, in the national economy 38,481 jobs. And there would be the work of a general office clerk, in the local economy there are 66 jobs, in the national economy 60,298 jobs. There would be the work of an inspector, in the local economy there are 13 jobs, in the national economy 14,075 jobs.

Q       Are those jobs consistent with the DOT?

A       Yes, Your Honor.

Q       The claimant testified she lies down during the day. If she had to lie down even one hour, in the a.m. of a workday, and one hour in the p.m. of a workday are those jobs affected?

A       Yes, Your Honor, there would be no jobs for this hypothetical individual.

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing

20

and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Prepares meals consisting of eggs, toast, cereal, and sandwiches (Tr. 113)

- Does laundry and runs errands (Tr. 113)

- Pays bills and manages bank accounts (Tr. 113)

- Shops for food and medication (Tr. 114)

- Swims, hunts, and fishes (Tr. 114)

- Participates in sports (Tr. 114)

- Dusts furniture and washes dishes (Tr. 160)

- Participates in child care (Tr. 160)

- Reads magazines for half an hour per day (Tr. 161)

- Listens to the radio for two hours per day (Tr. 161)

- Maintains a driver's license and drives a car (Tr. 349)

- Smokes half a pack of cigarettes per day (Tr. 349)

- Rests 3-4 hours per day (Tr. 354)


### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred (1) in using an improper legal standard to evaluate Claimant's credibility, and (2) in determining jobs that Claimant can perform exist in significant numbers in the national economy.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly assessed Claimant's credibility and correctly determined Claimant to be not disabled at the fifth step of the sequential evaluation process.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.

42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.       <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.       <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.       <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.       <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C. <u>Discussion</u>

I.

<u>The ALJ's Credibility Analysis of Claimant's Testimony</u>

Claimant first alleges the ALJ erred in determining Claimant's testimony regarding the severity of her impairments was not credible. Claimant argues the ALJ's opinion mentions Claimant's failure to quit smoking as a reason for not fully crediting her testimony. Claimant alleges the ALJ employed an improper legal standard when evaluating her smoking. In the alternative, she claims the ALJ's factual determinations regarding the extent of her smoking are not supported by substantial evidence.

A.

The Legal Standard Applicable to Consideration of Claimant's Smoking

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. As long as the ALJ followed the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them. Milburn, 138 F.3d at 528.

The ALJ determined Claimant has medically determinable impairments that could cause some of the subjective symptoms she alleged, but found Claimant's testimony on the severity of those symptoms not credible. (Tr. 19). One of the reasons he found her testimony not credible was her smoking. In relevant part, the ALJ noted that:

> The claimant testified at the hearing that she smokes one-half pack of cigarettes per day. Howver [sic], she reported to Dr. Noel at Healthsouth that she had been a pack a day smoker for twenty-five to thirty years. She also testified that she had not been told that surgery could be done unless she stopped smoking. However, Dr. France's report clearly states that he required that the claimant stop smoking if she hoped to go ahead with the L4-L5 fusion. This requirement to stop smoking is also mentioned in the vocational progress report done by Amy Snively on October 26, 2003.

Claimant challenges only the ALJ's application of the second step of <u>Craig</u>. She contends the ALJ gave legally impermissible weight to her failure to quit smoking in determining the credibility of her testimony regarding her subjective symptoms. The ALJ's application of the law is reviewed de novo. <u>Milburn</u>, 138 F.3d at 528.

Claimant cites case law in support of her argument. She first cites <u>Gordon v. Schweiker</u>, 725 F.2d 231 (4th Cir. 1984). In <u>Gordon</u>, the court held that Commissioner may only deny a person benefits based on the failure to stop smoking "if she finds that a physician has prescribed that the claimant stop smoking . . . and the claimant is able voluntarily to stop." <u>Id.</u> at 236. Claimant also cites to <u>Preston v. Heckler</u>, 769 F.2d 988, 990-91 (4th Cir. 1985), where the court determined that "if noncompliance is to be a basis for denying benefits, the Secretary must develop a record establishing by substantial evidence that the claimant's impairment 'is reasonably remediable by the particular individual involved, given . . . her social or psychological situation,' and that this claimant lacks good cause for failing to follow" the treatment doctors have ordered (citations omitted).

Claimant misapprehends the significance of <u>Gordon</u> and <u>Preston</u>.[6] The holdings of both <u>Gordon</u> and <u>Preston</u> dealt with situations where benefits could be denied because a person refused to stop smoking. <u>Gordon</u>, 725 F.2d at 236; <u>Preston</u>, 769 F.2d at 990-91. They deal with situations where the refusal is itself dispositive. <u>Gordon</u>, 725 F.2d at 236; <u>Preston</u>, 769 F.2d at 990-91. By contrast, the ALJ here considered Claimant's refusal to stop smoking as part of his

---

[6] The Court notes that another case cited by Claimant, <u>Lovejoy v. Heckler</u>, 790 F.2d 1114 (4th Cir. 1986), is also inapposite. In <u>Lovejoy</u>, the court found Commissioner may not deny benefits because a claimant cannot afford treatment. <u>Id.</u> at 1117. Claimant has not alleged the ALJ penalized her for not undergoing treatment she cannot afford.

credibility analysis of Claimant's testimony.  (Tr. 19).  The ALJ determined Claimant's continued

smoking in the face of physician advice to quit undermined the severe symptoms alleged.  <u>Id.</u>

The ALJ eventually denied Claimant benefits not because of the refusal to quit smoking, but

because he determined jobs existed in significant numbers in the national economy that Claimant

could perform.  (Tr. 25).[7]

     The Regulations give the ALJ the ability to consider inconsistencies in the evidence as a

factor in determining the credibility of the subjective symptoms she alleged.  20 C.F.R. §

404.1529(c)(4).  The Regulations provide Commissioner should "consider whether there are any

inconsistencies in the evidence and the extent to which there are any conflicts between your

statements and the rest of the evidence, including your history, the signs and laboratory findings,

and statements by your treating or nontreating source . . . about how your symptoms affect you."

<u>Id.</u>  As the ALJ noted, Claimant's doctors determined surgery was a possibility for relieving her

symptoms, but that Claimant needed to stop smoking before the surgery.  (Tr. 19, 254-55).

Nevertheless, Claimant continued to smoke.  (Tr. 349).  The ALJ was entitled to consider the

refusal to stop smoking even though it was necessary to undergo beneficial surgery as a factor

showing Claimant's symptoms were not as severe as she alleged.

B.

<u>The Factual Basis of the ALJ's Credibility Determination Regarding Claimant's Smoking</u>

     Claimant next argues the ALJ's determination that her continued smoking habit detracted

from her credibility lacks support in the record.  The ALJ stated that "The claimant testified at the

---

[7] The Court notes Claimant also takes issue with this finding and this assignment of error
will be discussed later.

hearing that she smokes one-half pack of cigarettes per day. Howver [sic], she reported to Dr. Noel at Healthsouth that she had been a pack a day smoker for twenty five to thirty years." (Tr. 19). Yet Claimant points out that while she did tell Dr. Noel she smoked a pack per day, she subsequently told multiple physicians she smoked only half a pack per day. (Tr. 252, 257, 320). Claimant argues this shows she tried to reduce her smoking. Thus, Claimant contends her testimony was fully consistent with the medical record.

Claimant is correct that the ALJ's statement that Claimant's testimony regarding the amount of her smoking is inconsistent with the medical record lacks substantial evidence to support it. Dr. France indicated Claimant smoked only half a pack her day in June 2003. (Tr. 257). Dr. Koay reported the same in March 2004. The ALJ's finding to the contrary is plainly contrary to the record and therefore lacks support in substantial evidence.

Nevertheless, the Court still affirms the ALJ's decision in this regard since the small mistake regarding Claimant's smoking was not a material error. The Court may affirm the decision of the ALJ where the ALJ makes small errors that do not affect the substance of the decision. Morgan v. Barnhart, 142 Fed. Appx. 716, 723 (4th Cir. 2005) (quoting Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004)). In Morgan, the Fourth Circuit stated in the Social Security context that

> While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.

Morgan, 142 Fed. Appx. at 723 (quoting Ngarurih, 371 F.3d at 190 n. 8); see also Morris v. Barnhart, 326 F. Supp. 2d 1203, 1209 (D. Kan. 2004).

Given that the ALJ listed numerous reasons for finding Claimant's testimony less than fully credible, it is clear that the small error discussed above did not affect the substance of the decision. Morgan, 142 Fed. Appx. at 723 (quoting Ngarurih, 371 F.3d at 190 n. 8). The ALJ mentioned that although Claimant alleged severe symptoms, she still performed "cooking, dishwashing, laundry, dusting, and child care . . . grocery shopping one to two times a month, went to doctor's appointments once or twice a month, paid bills, and sometimes picked up her daughter at school." Id. The ALJ further stated that although Claimant alleged her limitations forced her to lay down three to four hours every day, functional capacity evaluations indicated the opposite. (Tr. 19, 232, 286). Claimant's smoking habit is still relevant here in that she was told to quit if she wished to have possibly beneficial surgery, but she decided to continue smoking. (Tr. 19, 254-55, 349). The ALJ noted this in his opinion, as he could validly do, as discussed above in A. (Tr. 19). Additionally, the ALJ exhaustively discussed how the medical records were inconsistent with Claimant's subjective complaints. (Tr. 20-23). It is well set forth in his own opinion. (Tr. 20-23). The ALJ's analysis would almost certainly not change from reconsideration of this one piece of evidence. His error regarding Claimant's smoking habit was harmless.

II.

The ALJ's Reliance on the Testimony of the Vocational Expert

Claimant contends the ALJ erred in relying on the testimony of the Vocational Expert to determine that jobs exist in significant numbers in the national economy that Claimant can

perform given her limitations. Claimant raises two arguments here. First, she claims the ALJ's hypothetical question to the Vocational Expert failed to properly include the frequency Claimant needs to alternate sitting and standing. Second, Claimant argues one of the jobs the Vocational Expert stated Claimant could perform did not conform to the ALJ's own assessment of Claimant's residual functional capacity and therefore should have been discounted by the ALJ.

A.

### The ALJ's Hypothetical Question to the Vocational Expert

Claimant contends the ALJ's hypothetical question to the Vocational Expert failed to adequately inform the Vocational Expert of the frequency with which Claimant needs the ability to alternate sitting and standing. The Fourth Circuit has held that proper questions to a Vocational Expert must incorporate all evidence. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). However, the court has also held, albeit in an unpublished opinion, that while questions to a Vocational Expert must fairly set out all of Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, No. 02-1201, 2003 WL 257494, at *4 (4th Cir. Feb. 7, 2003).[8] The Russell court further stated that hypothetical questions may omit non-severe impairments, but must include those the ALJ finds severe. Id.

Since the ALJ found Claimant suffered from the severe impairments of "degenerative disc disease of the lumbar and cervical spine, lateral epicondylitis of the left elbow, and headaches," he had a duty to account for these impairments in his hypothetical question to the ALJ. Id. Claimant only challenges the alleged failure to include the frequency she needs to

---

[8] This Court recognizes that the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it.

alternate sitting and standing.  The ALJ asked only one question to the Vocational Expert.  In relevant part, the ALJ asked the Vocational Expert to assume a person who needs a "sit/stand option."  (Tr. 363).  It is evident the ALJ included this limitation as arising from the Claimant's degenerative disc disease.  (Tr. 252-53).  Although the ALJ told the Vocational Expert to assume a person who needed this "option," the ALJ's residual functional capacity of Claimant included the requirement that Claimant have the ability "to sit or stand at will during the work day."  (Tr. 23).  Claimant contends this difference in phrasing is critical and that the question failed to adequately inform the Vocational Expert of Claimant's limitations.  Since the adequacy of the ALJ's hypothetical question is a question of law, the Court undertakes de novo review.  Milburn, 138 F.3d at 528.[9]

Case law within the Fourth Circuit clearly indicates the term "sit/stand option" provides for the ability to "sit or stand at will during the workday."  In Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002), the ALJ asked the Vocational Expert a hypothetical question including a "sit/stand option."  The Fourth Circuit found another way of saying this as that the claimant needed "to sit or stand at his option."  Id. at 289.  In Zarkowski v. Barnhart, 417 F. Supp. 2d 758, 762 (D.S.C. 2006), the Vocational Expert testified that a "sit/stand option" meant the claimant could "either sit or stand as was necessary."  The court in Perkins v. Apfel, 101 F. Supp. 2d 365, 377-78 (D. Md. 2000) also described a "sit/stand option" as "the option to sit or stand as needed."

---

[9] Commissioner urges the Court to uphold the ALJ because he "gave Plaintiff the benefit of the doubt by adding a sit-stand option."  Def.'s Br. at 11.  Commissioner argues the medical records do not support the need for a sit-stand option, and thus the ALJ's inclusion of it was unnecessary.  Id.  In advancing this argument, Commissioner asks the Court to uphold the ALJ on different legal grounds.  The Fourth Circuit has held this impermissible.  Preston, 769 F.2d at 990.  The ALJ's decision may only be upheld on the grounds stated in his opinion.  Id.

Thus, the ALJ's hypothetical question fully advised the Vocational Expert of Claimant's need to "sit or stand at will during the workday."

B.

The Vocational Expert's Testimony Regarding Jobs Claimant Can Perform

Claimant finally argues that while the Vocational Expert testified Claimant could perform the work of general office clerk, the Dictionary of Occupational Titles (DOT) shows this job requires a higher residual functional capacity than the ALJ assigned to Claimant. Thus, Claimant contends the ALJ could not rely on this testimony to determine work exists Claimant can perform.

The Regulations provide the ALJ may consider Vocational Expert testimony and the DOT in determining whether work exists suited to a claimant's residual functional capacity. 20 C.F.R. § 404.1566. Social Security Ruling (SSR) 00-4p states Vocational Expert testimony and the DOT should normally be consistent. Where a conflict exists, neither source automatically prevails. Id. The ALJ should ask the Vocational Expert about any conflicts between his testimony and the DOT. The ALJ should resolve a conflict by deciding whether the Vocational Expert testimony is reasonable and provides grounds for relying on the testimony over the DOT.

The ALJ asked the Vocational Expert if there were any jobs available to a hypothetical individual limited to sedentary work and having other limitations of Claimant. (Tr. 363). The Vocational Expert responded in the affirmative and identified the jobs of interviewer, general office clerk, and inspector. (Tr. 364). The ALJ asked if these jobs conformed to the DOT and the Vocational Expert responded they did. Id. The ALJ relied on this testimony in determining work existed for Claimant and therefore finding her not disabled. (Tr. 25). This factual determination will be upheld as long as substantial evidence supports it. Hays, 907 F.3d at 1456.

As Claimant correctly points out, the DOT defines the position of general office clerk as a light exertion job, not a sedentary job. DOT 209.562-010. This is plainly inconsistent with the Vocational Expert's testimony. The ALJ did not elicit any testimony to explain this discrepancy. (Tr. 363-64). Therefore, the ALJ's decision that Claimant has the capability to perform the work of general office clerk is not supported by substantial evidence.[10]

Commissioner has the burden of showing work exists in significant numbers in the national economy that Claimant can perform. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). If Commissioner cannot meet this burden, Claimant is entitled to benefits. 42 U.S.C. § 423(a); 20 C.F.R. § 404.1560(c). Claimant correctly points out that when the general office clerk position is taken away, a substantial number of jobs the ALJ relied upon to determine significant numbers of jobs exist disappears. Claimant argues significant numbers of jobs do not exist and asks the Court to award benefits. Yet Commissioner contends that even if the clerk position is discounted, significant numbers of jobs that Claimant can perform still exist in the national economy. Commissioner urges the Court to affirm the ALJ.

The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The work

---

[10] The Court notes that while Commissioner contested this point, she did so only weakly. Commissioner's brief simply stated that "Plaintiff's second argument – that the Commissioner failed to meet her burden of production at step five because the vocational expert failed to identify jobs existing in significant numbers in the national economy – also lacks merit." Def.'s Br. at 12. The remainder of Commissioner's argument on this point addresses why even if the ALJ erred, the Court should uphold him. Id. at 12-14.

does not have exist "in the immediate area in which" the claimant resides. Id.; 20 C.F.R. § 404.1566(a)(1) (stating it is irrelevant whether "work exists in the immediate area in which you live"). The Regulations further provide that "isolated jobs that exist only in very limited numbers in relatively few locations outside the region where you live are not considered 'work which exists in the national economy.'" 20 C.F.R. § 404.1566(b). The Fourth Circuit has stated that "the regulations make irrelevant the claimant's actual ability to work . . . the Secretary must show that work exists in the national economy which the claimant could perform." Pass v. Chater, 65 F.3d 1200, 1205 n. 4 (4th Cir. 1995). The court also quoted 20 C.F.R. § 416.966(a) for this proposition. Id.

Case law from other courts makes clear there is a split of authority regarding whether Commissioner may prove significant numbers of jobs exist by only presenting evidence of national numbers of jobs. The Court is not aware of any precedent from the Fourth Circuit or the Northern District of West Virginia that directly addresses this question.

The first view looks to the plain language of the statute and allows Commissioner to present evidence of jobs either in the region the claimant resides or nationally. Evidence of significant numbers of jobs at either level suffices to deny the claimant benefits. In Allen v. Bowen, 816 F.2d 600, 603 (11th Cir. 1987), the claimant offered new evidence to show significant numbers of jobs did not exist for him at the local level. Yet the court held that "The appropriate focus under the regulation, however, is the national economy. Thus, even if Allen's evidence were credible to the lack of jobs in his geographic area, his failure to disprove the existence of such jobs on a national scale would leave the ALJ's finding intact." Id. at 603 (citations omitted). The court in Leonard v. Heckler, 582 F. Supp. 389, 391 (M.D. Pa. 1983) took

a national perspective when, in finding a significant number of jobs did not exist, it stated that only limited work existed in the entire country. Given the case's limited discussion, however, it cannot be said with certainty how the court would rule today. Id. at 391.

Most of the remainder of precedent for this view is unpublished. Nevertheless, it can prove instructive. In Lirley v. Barnhart, 124 Fed. Appx. 283-84 (5th Cir. 2005), the court held that because Commissioner had produced evidence of a significant number of jobs at the national level, this represented a significant number of jobs under the statute. The Ninth Circuit held likewise in Murray v. Apfel, 5 Fed. Appx. 617, 619 (9th Cir. 2001). The District of South Carolina has also agreed with this view. Smith v. Sec'y of Health & Human Servs., 1982 U.S. Dist. LEXIS 18107, at * 11 (D.S.C.). In Welch v. Barnhart, 2003 U.S. Dist. LEXIS 19632, at *14 (D. Me.), the court stated that "The commissioner took the position . . . that the existence of more than 50,000 [jobs] nationally was sufficient to meet the 'significant number' requirement, regardless of the number of jobs available regionally. The regulations support this position." Finally, the court in Huber v. Apfel, 1999 U.S. Dist. LEXIS 21385, at *15 (S.D. Ala.), put it most bluntly when it held that "work the plaintiff can perform exists in significant numbers in the national economy, [so] it is irrelevant whether it also exists in significant numbers at the local or state level."

The second view requires Commissioner to present evidence of significant numbers of jobs the claimant can perform in the region he lives. This view is clearly expressed in Mericle v. Shalala, 892 F. Supp. 843, 846-47 (E.D. Tex. 1995). Relying on 20 C.F.R. § 404.1566, which provides that "isolated jobs" outside the claimant's region do not constitute significant numbers of jobs, the court concluded that "the plaintiff's region determines the expanse of the 'national

35

economy' for purposes of significant numbers." <u>Id.</u> at 846-47.

The Sixth, Eighth, and Tenth circuits have all adopted the same standard to determine whether a significant number of jobs exist, but their position on whether a national number of jobs may be considered is unclear. These courts have adopted the following standard:

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling [sic] to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

<u>Jenkins v. Bowen</u>, 861 F.2d 1083, 1087 (8th Cir. 1988) (quoting <u>Hall v. Bowen</u>, 837 F.2d 272, 275 (6th Cir. 1988)); <u>see also</u> <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1330 (10th Cir. 1992) (adopting the same standard). The standard mentions the claimant's ability to travel and the "isolated nature of the jobs." <u>Hall</u>, 837 F.2d at 275. This emphasizes regional importance. Yet the court in <u>Born v. Sec'y of Health & Human Servs.</u>, 923 F.2d 1168, 1175 (6th Cir. 1990) held that 800,000 national jobs represented a significant number, though the court also talked about the number of local jobs. The court in <u>Johnson v. Chater</u>, 108 F.3d 178, 180 (8th Cir. 1997) mentioned that "the vocational expert did not give figures . . . [of] jobs in Iowa or the national economy." That the "national economy" was mentioned aside from the regional economy implies national numbers may be considered. Furthermore, these courts have not specifically limited the relevant area to the regional economy, as the <u>Mericle</u> court did. <u>Mericle</u>, 892 F. Supp. at 846-47. Thus, these courts probably would permit Commissioner to show national figures, though they prefer local numbers. This Court concludes the plain language of the statute and the regulations permit Commissioner to demonstrate significant numbers of jobs in either the regional economy or the

national economy. It is axiomatic that unambiguous language controls. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, ___, 125 S.Ct. 2611, 2625-26, 162 L.Ed.2d 502, 525-26 (2005). The statute allows Commissioner to show jobs "***either*** in the region where such individual lives ***or*** in several regions of the country" (emphasis added). The statute is phrased in the alternative. Commissioner may show either one to satisfy her burden. As the Allen court held, if Commissioner demonstrates significant numbers of national jobs, the numbers of regional jobs is irrelevant. Allen, 816 F.2d at 603.

The facts of other cases can prove instructive for the number of available jobs courts consider sufficient to represent significant numbers.[11] In Allen, the court affirmed the ALJ where the Vocational Expert testified the claimant could perform 174 jobs locally and 80,000 nationally. Allen, 816 F.2d at 602. In Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997), the court affirmed the ALJ where the evidence supported that claimant could perform 200 jobs locally and only 10,000 nationally. The Lirley court found 50,000 national jobs significant and the Murray court determined 52,000 satisfied the standard. Lirley, 124 Fed. Appx. at 284; Murray, 5 Fed. Appx. at 619.

The Court agrees with Commissioner that even without the general office clerk position, Claimant can perform significant numbers of jobs in the national economy and therefore the ALJ should be affirmed. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c);

---

[11] Courts have rejected inquiring into the percentages of jobs available a number of jobs represents. Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474, 1479 (9th Cir. 1989); Hall, 837 F.2d at 275. Although the Smith court held otherwise, this court is more persuaded by the views of the Barker and Hall courts. Smith, 1982 U.S. Dist. LEXIS at *12. As the Barker court stated, "The plain language of the regulations do [sic] not contemplate a ratio analysis. The regulations speak in terms of whether a significant *number* of jobs exist that the claimant is capable of performing." Barker, 882 F.2d at 1479 (quoting Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir. 1986)).

McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The Vocational Expert here testified that aside from the general office clerk position, Claimant could perform the work of interviewer and inspector. (Tr. 364). Regarding the interviewer position, he testified 78 jobs existed locally and 38,481 nationally. Id. For the inspector position, he testified there were 13 jobs locally and 14,075 nationally. Id. Combined, this yields a total of 91 local jobs and 52,556 national jobs. Id. Claimant has not contested the Vocational Expert's testimony regarding these other positions. The large number of national positions makes the small local number irrelevant. Claimant has "significant numbers" of work available to her and therefore is not entitled to benefits. 20 C.F.R. § 404.1560(c).

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be DENIED.

2.     Commissioner's Motion for Summary Judgment be GRANTED because the ALJ could consider Claimant's smoking habit in determining her credibility; because even though the ALJ made a factual error when evaluating Claimant's smoking habit, the error was not material; because the ALJ's question to the Vocational Expert about a "sit/stand option" adequately informed him of Claimant's need to sit or stand at will; and because although the ALJ relied on erroneous Vocational Expert testimony that Claimant could perform the work of general office clerk, Claimant still had significant numbers of jobs available to her in the national economy..

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: October 18, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE